IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

No. 5:22-CV-190-RJ

MICHAEL SHANE CLAYTON,

            Plaintiff/Claimant,

v.

                                   O R D E R

KILOLO KIJAKAZI,
Acting Commissioner of Social Security,

            Defendant.

This matter is before the court on the parties' cross-motions for judgment on the pleadings [DE-17, -19] pursuant to Fed. R. Civ. P. 12(c). Claimant Michael Shane Clayton ("Claimant") filed this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) seeking judicial review of the denial of his applications for a period of disability, Disability Insurance Benefits ("DIB"), and Supplemental Security Income ("SSI") payments. The time for filing responsive briefs has expired, and the pending motions are ripe for adjudication. Having carefully reviewed the administrative record and the motions and memoranda submitted by the parties, Claimant's Motion for Judgment on the Pleadings is denied, Defendant's Motion for Judgment on the Pleadings is allowed, and the final decision of the Commissioner is affirmed.

## I. STATEMENT OF THE CASE

Claimant protectively filed applications for a period of disability, DIB, and SSI on August 7, 2019, alleging disability beginning August 1, 2015, later amended to May 28, 2019. (R. 14, 267–80, 313). Both claims were denied initially and upon reconsideration. (R. 14, 78–155). A hearing before the Administrative Law Judge ("ALJ") was held on May 12, 2021, at which

Claimant, represented by counsel; and a vocational expert ("VE") appeared and testified. (R. 11–41). On October 4, 2021, the ALJ issued a decision denying Claimant's request for benefits. (R. 14–36). On April 1, 2022, the Appeals Council denied Claimant's request for review. (R. 1–6). Claimant then filed a complaint in this court seeking review of the now-final administrative decision.

## II. STANDARD OF REVIEW

The scope of judicial review of a final agency decision regarding disability benefits under the Social Security Act ("Act"), 42 U.S.C. § 301 *et seq.*, is limited to determining whether substantial evidence supports the Commissioner's factual findings and whether the decision was reached through the application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). "The findings of the Commissioner . . . as to any fact, if supported by substantial evidence, shall be conclusive . . . ." 42 U.S.C. § 405(g). Substantial evidence is "evidence which a reasoning mind would accept as sufficient to support a particular conclusion." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). While substantial evidence is not a "large or considerable amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988), it is "more than a mere scintilla . . . and somewhat less than a preponderance." *Laws*, 368 F.2d at 642. "In reviewing for substantial evidence, [the court should not] undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [Commissioner]." *Mastro v. Apfel*, 270 F.3d 171, 176 (4th Cir. 2001) (quoting *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996), *superseded by regulation on other grounds*, 20 C.F.R. § 416.927(d)(2)). Rather, in conducting the "substantial evidence" inquiry, the court's review is limited to whether the ALJ analyzed the relevant evidence and sufficiently explained his or her findings and rationale in crediting the evidence. *Sterling Smokeless Coal Co. v. Akers*, 131 F.3d

2

438, 439–40 (4th Cir. 1997).

## III. DISABILITY EVALUATION PROCESS

The disability determination is based on a five-step sequential evaluation process as set forth in 20 C.F.R. §§ 404.1520 and 416.920 under which the ALJ is to evaluate a claim:

> The claimant (1) must not be engaged in "substantial gainful activity," i.e., currently working; and (2) must have a "severe" impairment that (3) meets or exceeds [in severity] the "listings" of specified impairments, or is otherwise incapacitating to the extent that the claimant does not possess the residual functional capacity to (4) perform . . . past work or (5) any other work.

*Albright v. Comm'r of the SSA*, 174 F.3d 473, 475 n.2 (4th Cir. 1999). "If an applicant's claim fails at any step of the process, the ALJ need not advance to the subsequent steps." *Pass v. Chater*, 65 F.3d 1200, 1203 (4th Cir. 1995) (citation omitted). The burden of proof and production during the first four steps of the inquiry rests on the claimant. *Id.* At the fifth step, the burden shifts to the ALJ to show that other work exists in the national economy which the claimant can perform. *Id.*

When assessing the severity of mental impairments, the ALJ must do so in accordance with the "special technique" described in 20 C.F.R. §§ 404.1520a(b)–(c) and 416.920a(b)–(c). This regulatory scheme identifies four broad functional areas in which the ALJ rates the degree of functional limitation resulting from a claimant's mental impairment(s): understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; and adapting or managing oneself. *Id.* §§ 404.1520a(c)(3), 416.920a(c)(3). The ALJ is required to incorporate into his written decision pertinent findings and conclusions based on the "special technique." *Id.* §§ 404.1520a(e)(3), 416.920a(e)(3).

In this case, Claimant alleges the following errors: (1) the ALJ failed to properly assess Claimant's Residual Functional Capacity ("RFC"), and (2) the ALJ failed to include in her RFC calculation an allowance for off-task time and absences that would preclude work based on the

3

VE's testimony.  Pl.'s Mem. [DE-18] at 6–9.

## IV.  ALJ'S FINDINGS

Applying the above-described sequential evaluation process, the ALJ found Claimant "not disabled" as defined in the Act.  At step one, the ALJ found Claimant had not engaged in substantial gainful activity since May 28, 2019, the amended alleged onset date.  (R. 16).  Next, the ALJ determined Claimant had the following severe impairments: degenerative disc disease; degenerative joint disease; diabetes mellitus; hypertension; congestive heart failure; obesity; reflex sympathetic dystrophy (RSD) of the left upper extremity; depression; anxiety; trauma and stressor-related disorders; and a personality disorder.  (R. 17).  The ALJ also found Claimant had nonsevere impairments of gastroesophageal reflux disease (GERD), diarrhea, and dysphagia.  *Id.*  However, at step three, the ALJ concluded these impairments were not severe enough, either individually or in combination, to meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (R. 17–21).  Applying the technique prescribed by the regulations, the ALJ found that Claimant's mental impairments have resulted in moderate limitations in understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; and adapting or managing oneself.  (R. 20–21).

Prior to proceeding to step four, the ALJ assessed Claimant's RFC, finding Claimant had the ability to perform light work[1] requiring the following limitations:

> [T]he claimant … can frequently push/pull with the bilateral upper extremities; he can frequently reach overhead with the bilateral upper extremities; he can

---

[1] Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If an individual can perform light work, he or she can also perform sedentary work, unless there are additional limiting factors such as the loss of fine dexterity or the inability to sit for long periods of time. 20 C.F.R. §§ 404.1567(b), 416.967(b).

4

occasionally handle/finger with the left, non-dominant, upper extremity; the claimant would need to avoid concentrated exposure to extreme heat and cold, as well as vibrations; he will need to avoid concentrated exposure to pulmonary irritants such as fumes, odors, dust, gases, and poorly ventilated areas; the claimant can frequently stoop and occasionally climb ladders, ropes, or scaffolds; he would need to avoid all exposure to unprotected heights, moving machinery, and hazardous machinery; further, the claimant can understand, remember, and carry out instructions that is consistent with a reasoning level of "two" or "three" as defined in the Dictionary of Occupational Titles (DOT); he can sustain concentration, attention, and pace sufficient enough to carry out those instructions over the course of an eight-hour workday and at two-hour intervals; he can work in proximity to, but not coordination with co-workers and supervisors; the claimant can have only superficial contact with the public; he can perform jobs that do not require completion of a specific number of production quotas on a defined timeline or perform fast paced assembly line work; and the claimant would be off-task no greater than five-percent of the time in an eight-hour workday, in addition to normal breaks (with normal breaks defined as a 15-minute morning and afternoon break and a 30-minute lunch break).

(R. 21–35). In making this assessment, the ALJ found Claimant's statements about his limitations not entirely consistent with the medical and other evidence. (R. 23). At step four, the ALJ concluded Claimant did not have the RFC to perform the requirements of his past relevant work as a quality assurance specialist. (R. 35). Nonetheless, at step five, upon considering Claimant's age, education, work experience, and RFC, the ALJ determined Claimant is capable of adjusting to the demands of other employment opportunities that exist in significant numbers in the national economy. (R. 35–36).

## V. DISCUSSION

### A.    The ALJ's RFC Determination

Claimant contends that the ALJ failed to properly assess Claimant's RFC. Pl.'s Mem. [DE-18] at 6–8. Specifically, Claimant argues that the RFC assigned is inconsistent with the medical evidence, the third-party statement from Claimant's brother, and Claimant's testimony. *Id.* Claimant further contends that the ALJ also improperly considered medical opinions. *Id.* On the

5

other hand, Defendant argues that the ALJ reasonably found that Claimant could perform a reduced range of light work with limitations. Def.'s Mem. [DE-20] at 6–15.

An individual's RFC is the capacity an individual possesses despite the limitations caused by physical or mental impairments. 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1); *see also* SSR 96-8p, 1996 WL 374184, at *1 (July 2, 1996). The RFC is based on all relevant medical and other evidence in the record and may include a claimant's own description of limitations arising from alleged symptoms. 20 C.F.R. §§ 404.1545(a)(3), 416.945(a)(3); *see also* SSR 96-8p, 1996 WL 374184, at *5. "[T]he residual functional capacity 'assessment must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis, including the functions' listed in the regulations." *Mascio v. Colvin*, 780 F.3d 632, 636 (4th Cir. 2015) (quoting SSR 96-8p). The ALJ must provide "a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." *Id.* (quoting SSR 96-8p); *see also Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000) (observing that the ALJ "must build an accurate and logical bridge from the evidence to his conclusion").

Federal regulations 20 C.F.R. §§ 404.1529(a) and 416.929(a) provide the authoritative standard for the evaluation of subjective complaints of pain and symptomology, whereby "the determination of whether a person is disabled by pain or other symptoms is a two-step process." *Craig*, 76 F.3d at 593–94. First, the ALJ must objectively determine whether the claimant has medically documented impairments that could cause his or her alleged symptoms. SSR 16-3p, 2016 WL 1119029, at *3 (Mar. 16, 2016); *Hines v. Barnhart*, 453 F.3d 559, 564 (4th Cir. 2006). If the ALJ makes that determination, he must then evaluate "the intensity and persistence of the claimant's pain[,] and the extent to which it affects her ability to work," *Craig*, 76 F.3d at 595,

6

including whether the claimant's statements are supported by the objective medical record. SSR 16-3p, 2016 WL 1119029, at \*4; *Hines*, 453 F.3d at 564–65.

Objective medical evidence may not capture the full extent of a claimant's symptoms, so where the objective medical evidence and subjective complaints are at odds, the ALJ should consider all factors concerning the "intensity, persistence and limiting effects" of the claimant's symptoms. SSR 16-3p, 2016 WL 1119029, at \*7; 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3) (showing a complete list of factors). The ALJ may not discredit a claimant solely because his or her subjective complaints are not supported by objective medical evidence, *Craig*, 76 F.3d at 595– 96, but neither is the ALJ required to accept the claimant's statements at face value; rather, the ALJ must "evaluate whether the statements are consistent with objective medical evidence and the other evidence." SSR 16-3p, 2016 WL 1119029, at \*6; *see Taylor v. Astrue*, No. 5:10-CV-263-FL, 2011 WL 1599679, at \*4–8 (E.D.N.C. Mar. 23, 2011), *adopted by* 2011 WL 1599667 (E.D.N.C. Apr. 26, 2011).

### 1. Claimant's Statements

The ALJ summarized Claimant's hearing testimony as follows. Claimant lived with his brother, and he has not received income since 2015, when a nurse recommended he take time off from work because of his hypertension and heart rate. During that time Claimant took more pain medication than prescribed due to emotional issues and began using illicit drugs, which continued upon returning to work. Claimant was laid off because of his drug usage and physical issues but has been "clean and sober" for the past couple of years. He applied for other jobs but his health worsened due to chronic heart failure, diabetes, increased pain, nerve pain, and RSD. Claimant cannot use his left hand very much and cannot let anything touch his left hand because the pain is unbearable, which has been an issue for the past three to four years. Claimant can lift 30-to-50

7

pounds with his right hand, but probably cannot carry that much weight. Claimant has a frozen left shoulder, a pinched bicep tendon, back pain, and arthritis in his hip. His chronic heart failure causes shortness of breath, even when walking to the mailbox, and he is on three medications for his heart, with fluid control, as well as medication for cholesterol, hypertension, and diabetes. Claimant can only walk for a few minutes at a time, cannot lift much weight, and can lift no weight with his left hand. He generally lies around during the day, normally sleeps because he is alone while his brother is at work, and sees his sister occasionally. Claimant has depression, which affects his memory and concentration, and although medication helps with his mood swings he continues to experience anxiety and racing thoughts. (R. 22).

### a. Mental Health Symptoms

Relating to Claimant's mental health symptoms, the ALJ discussed in detail Claimant's intermittent treatment with his primary care provider at the Department of Veterans Affairs ("VA") and consultative psychological examinations in September 2020 and May 2021. (R. 23–30, 842, 847–51, 965–72, 1205–08, 1431–39).

During his mental health treatment, Claimant initially complained of anxiety, depression, and insomnia due to racing thoughts and later he noted being easy to anger, feeling on edge, and not eating well due to stress and anxiety. (R. 23, 1205). In therapy, Claimant reported that his physical impairments, chronic pain, and financial problems made his depression worse and that his medications were not helpful. (R. 24, 1205–06). The ALJ noted that Claimant was lost to mental health treatment from mid-October 2018 to February 2019, despite attending physical therapy and other medical appointments. (R. 24, 1207). Upon resumption of mental health treatment, Claimant continued to report his medications being ineffective and his pain affecting his mood, along with some passive suicidal ideation, and he also reported PTSD symptoms that

8

were noted as "questionable" due to his inability to identify a clear stressor. (R. 25–26, 1207–08). By the end of 2019, Claimant reported his sleep was a bit better on Seroquel but still disturbed and his medication was increased, and he was still depressed and angry but had no suicidal ideations. (R. 27, 1208). Claimant did not attend a psychiatry appointment in early 2020, and at an August 2020 consultative physical examination his mood and affect were appropriate, his thought process was linear and logical, his speech was normal, and he was alert and oriented. (R. 27, 842).

Claimant underwent consultative psychological examinations in September 2020 and May 2021, and the ALJ considered them both. In September 2020, Elizabeth A. Kauff, a licensed psychological associate, and EJ Burgess, a licensed Psychologist, opined that Claimant appeared capable of understanding and following simple directions but would likely have problems retaining instructions throughout the course of a workday, he would likely have difficulty working at an adequate pace secondary to distractibility, he would have problems sustaining adequate attention to tasks, he would have trouble with psychomotor slowing when attempting a job, he would have difficulty interacting appropriately with coworkers secondary to mood swings and poor anger management skill, and his level of stress tolerance was poor. (R. 28–29, 33, 847–51). The ALJ found this opinion somewhat persuasive, citing Claimant's sporadic mental health treatment and overall moderate mental status findings. (R. 34). In May 2021, claimant underwent a comprehensive psychological evaluation for the purpose of clarifying his diagnoses, due to unverified trauma, and forming a treatment plan. (R. 29, 965–72). Early in the interview, the claimant indicated he was "getting all worked up" and requested a break, the interview was terminated and scheduled for a follow-up one week later but Claimant failed to attend, and Claimant failed to attend a subsequent appointment and failed to return the examiner's phone calls. (R. 29, 965–66). Therefore, based on solely a records review, Claimant was diagnosed with

9

anxiety and depression and it was assessed that Claimant did not have a trauma related or personality disorder. (R. 29–30, 966–67).

The ALJ determined that, although Claimant experienced mental impairments, his mental health treatment at the VA was sporadic, he was never diagnosed with PTSD due to his vague descriptions of trauma and symptoms, he did not require emergency treatment, and he did not seek consistent mental health treatment from a specialist such as a psychologist, psychiatrist, therapist, or counselor. (R. 32). The ALJ imposed significant non-exertional restrictions in the RFC, including a limit to reasoning level of two or three, limited social interactions with co-workers, supervisors, and the public, and a low stress environment, which does not involve completion of a specific number of production quotas on a defined timeline or performance of fast paced assembly line work, in order to account for Claimant's limitations from his mental impairments. *Id.* This is not a case where the ALJ impermissibly cherry picked from the record. *See Lewis v. Berryhill*, 858 F.3d 858, 869 (4th Cir. 2017) ("[a]n ALJ has the obligation to consider all relevant medical evidence and cannot simply cherrypick facts that support a finding of nondisability while ignoring evidence that points to a disability finding.") (citing *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010)). Claimant has not cited any testimony or other evidence regarding his mental impairments that the ALJ failed to consider, essentially asking the court to reweigh the evidence. *See Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012) ("In reviewing for substantial evidence, [the court does] not undertake to reweigh conflicting evidence, make credibility determinations, or substitute our judgment for that of the ALJ.") (citation omitted). The ALJ properly considered Claimant's testimony regarding his mental impairments, and the court can trace the ALJ's reasoning and finds it is supported by substantial evidence.

10

## b. Physical Impairments

The ALJ discussed at length treatment notes, opinions, and examinations regarding Claimant's physical impairments, and noted Claimant's improved heart health, little if any significant emergency treatment for cardiac problems, hypertension, degenerative disc disease, and RSD of the left upper extremity, Claimant's lack of long term pain medications or surgery, sporadic treatment for diabetes, and finally that, despite his obesity, Claimant retained consistent function, muscle tone, and the ability to manipulate. (R. 23–32, 454, 590–94, 601–02, 615–32, 701–02, 814–20, 840–51, 857, 862–69, 1048, 1221–23, 1284–87, 1307–10, 1425, 1528–31, 1560–63).

Claimant, in May 2017 VA emergency room records, stated he had chronic heart failure, but had not been taking his medications for two months, had been hospitalized in the past, felt subjectively short of breath with ambulation, and was supposed to get a full cardiac workup but never went to the appointment. (R. 23, 1221). In Claimant's first VA appointment with a primary care provider in June 2017 he stated his biggest issue, aside from insomnia, anxiety, and depression, was lower back pain which had waxed and waned since his military service, and the pain was midline paraspinal in the bilateral lower back and occasionally radiated into the legs. (R. 23, 1222). Claimant stated he had been out of medications for the past few months, and he primarily spent his days lying down but would take his dog outside, shop, and perform some cleaning, laundry, sweeping, and dish washing. *Id.* The ALJ noted that Claimant reported back pain at a January 2018 appointment, but that an x-ray of his cervical spine and shoulder only revealed mild degenerative disc disease of the cervical spine and a negative left shoulder, though in April 2018 Claimant stated pain continued to bother him and that he had nerve pain in his arms, legs, feet, and back. *Id.* In September 2018 Claimant was evaluated for whole body pain, and the ALJ noted that Claimant indicated his pain was being managed with medications, though he also reported not

11

finding significant relief and that nothing made the pain better or worse. (R. 24, 1222–23). Regarding Claimant's heart health, the ALJ also noted a December 2018 appointment with a cardiologist where Claimant's ejection fraction was 50 percent, up from 15-to-20 percent during a 2016 appointment. (R. 24, 454, 857, 862–69).

In a December 2018 consultative examination, Claimant complained of dyspnea and chest pain with little to no exertion, that walking to the mailbox would give him chest pain and he would break out in sweats, that he had occasional severe back pain, generalized sharp, stabbing, burning, pain in most parts of his body, as well as bilateral shoulder pain, and numbness and sensitivity in his left hand, which is severe enough that he wears a glove to take a shower. (R. 24–25, 590–94). Claimant also reported his diabetes fluctuates because he lacks funds to manage it. *Id.* The ALJ noted that Claimant's lungs were normal, but he was positive for tachycardia on examination of the heart, and his extremities were negative for clubbing, cyanosis, or edema. *Id.* The ALJ also noted that Claimant's left shoulder pain was worse that the right, left hand grip was weaker than the right, he was able to bend about 75 degrees before having back pain, and he was able to toe-and-heel walk with mild balance problems. *Id.* Claimant's motor strength was normal and equal in all extremities, his cranial nerves were grossly intact, he had a non-ataxic gait, was negative for any signs of motor or sensory impairment but had subjective neuropathy complaints, and he was assessed with obesity, uncontrolled hypertension, tachycardia, bilateral shoulder pain, back pain, and tooth loss. *Id.* The ALJ further noted that an x-ray of the lumbar spine at that time showed moderate multilevel degenerative changes. (R. 25, 601–02).

Claimant was seen by a pain clinic in February 2019, due to exacerbation of left upper extremity RSD and complaints of bilateral shoulder pain from biceps tendonitis, however, Claimant was not a candidate for interventional pain procedures because of his uncontrolled

12

diabetes. (R. 25, 1560–63). At a neurological clinic in April 2019 for his RSD Claimant complained of problems with his left hand for about the past two years, which began as numbness and transitioned into pain. The ALJ stated that no skin color changes were noted, nor was any identifiable trigger to these events, examination of the left hand was abnormal and limited by pain, with slightly diminished grip strength, however, imaging was negative and Claimant was referred to a pain management specialist. (R. 25–26, 1048, 1528–31).

The ALJ pointed to a May 2019 MRI of the cervical spine, which showed a small right foraminal disc extrusion at C6-C7 as well as superimposed uncovertebral arthropathy with severe neural foraminal narrowing. *Id.* There was irregular stellate enhancing soft tissue structure in the lower neck, which represented a scar from a previous surgery. *Id.* The ALJ also noted an MRI of the left shoulder showed no evidence of brachial plexopathy. (R. 25–26, 701–02). The ALJ stated that stellate ganglion blocks in July and August 2019 were "very helpful" and reduced pain from an "eight" to a "two," though this only lasted a few weeks, and additionally that acupuncture in August 2019 had been moderately helpful for some of his pain. (R. 25–26, 615–32, 1425).

The ALJ noted that Claimant was seen for occupational therapy for his upper extremity in March 2020, that he was unable to identify precipitating factors, presented decreased right grip strength and pain in his hands bilaterally which affected function with daily tasks, and that he was instructed on the use of recommended orthotics and heat modality to reduce pain and promote function but no additional therapy was recommended. (R. 27, 1307–10). In a May 2020 telephone appointment, Claimant complained of hand pain, stated he was taking his insulin for diabetes, that his left shoulder pain improved after an injection, and a week after that call Claimant reported back pain was a "six" out of "ten" and requested prednisone, but the provider recommended over the counter pain medication and heat/ice. (R. 27, 814–20).

13

In an August 2020 consultative physical examination, the ALJ noted Claimant's complaints of musculoskeletal changes with chronic pain and uncontrolled type 2 diabetes, left shoulder pain with RSD and upper/lower back pain with intermittent right lower extremity sciatica, however the back pain was mostly managed with medication. (R. 27–28, 840–45). Examination of the neck, lungs, heart, abdomen, and extremities were normal, except the left hand was unable to be touched, extending upward with lessening to mid-upper arm, cranial nerves were intact, coordination and gait were normal, muscle strength and tone were normal and equal, except the left shoulder abduction was slightly diminished and the left hand "closed himself, did not touch," sensation and reflexes were normal, range of motion testing was normal except forward flexion and extension of the thoracolumbar spine and left shoulder, and the left shoulder showed mild tenderness to palpation. *Id.* The ALJ also noted that a November 2020 x-ray of Claimant's hip was essentially normal, with no evidence of acute fracture of dislocation, minimal bilateral hip degenerative changes, with slight superior narrowing and acetabular subchondral cystic changes. (R. 29, 1284–87).

Regarding Claimant's obesity, the ALJ stated that such was evaluated according to the requirements of SSR 19-2p. *Id.* Medical records show that Claimant's BMI was above 35, which marks "extreme" obesity. The ALJ stated that despite this, Claimant was able to move about generally well and sustain consistent function, he had good muscle tone, and additionally, and there was no objective evidence indicating Claimant suffered from significant sleep apnea or uncontrollable blood pressure. Thus, the ALJ concluded, the medical evidence failed to indicate Claimant's ability to manipulate has been negatively impacted by the presence of adipose tissue, and Claimant's obesity had not caused a negative effect upon his ability to perform routine movement beyond the very limited residual functional capacity stated above or upon his ability to

14

sustain function over an eight-hour day. (R. 32).

The ALJ determined that though Claimant had physical impairments, to the extent Claimant testified he is more limited, that testimony is not consistent with the medical and other evidence of record. (R. 31–32). The ALJ concluded that recent examinations showed normal cardiology findings, a lack of extensive emergency treatment or visits, hypertension and other conditions were stable, and no surgery was recommended, discussed, or suggested. *Id.* The ALJ pointed to, as an example, that there was little or no support for Claimant's testimony that he can only walk for a few minutes at a time, or that he needs to spend the majority of his day laying down and sleeping. *Id.* The ALJ also earlier noted that, despite hearing testimony, Claimant reported at consultative examinations he was able to do some household chores, including washing dishes and doing his laundry. (R. 21, 23).

The ALJ thoroughly described the medical record, which included consideration of consultative examinations, and concluded that Claimant was not as limited as he stated, and the court can follow the ALJ's reasoning. The ALJ did not appear to cherrypick evidence, and after considering subjective complaints and the objective record, imposed a range of light exertion with only occasional handling and fingering with the upper left extremity and other postural and environmental limitations to include frequent push/pull and reaching overhead with the bilateral upper extremities; frequent stooping and occasional climbing of ladder ropes or scaffolds; avoidance of all exposure to heights and hazards; and avoidance of concentrated exposure to temperature extremes and pulmonary irritants; and that Claimant would be off task 5% of the workday, in addition to regular breaks, due to the combination of physical and psychological based symptoms.

Regardless, while Claimant argues that the ALJ assigned RFC is not supported by

15

substantial evidence, he provides no citation to the record of specific evidence that the ALJ ignored, as it relates to Claimant's testimony and subjective statements, and essentially asks the court to reweigh the evidence. *See Hancock*, 667 F.3d at 472 (4th Cir. 2012) ("In reviewing for substantial evidence, [the court does] not undertake to reweigh conflicting evidence, make credibility determinations, or substitute our judgment for that of the ALJ.") (citation omitted). The court can trace the ALJ's reasoning, and accordingly, the ALJ did not err in evaluating Claimant's subjective statements and testimony regarding his physical limitations.

## 2. Third-Party Statement

Claimant's brother, Randy Clayton, wrote a third party-statement regarding Claimant. (R. 402–03). Randy Clayton wrote that his brother (Claimant) has been in poor health for several years and has well documented medical records in support of his disability claim. He stated that Claimant has lived with him for over five years and that Claimant tries to help with domestic chores and everyday tasks, "but he cannot hold out to do many things that most people take for granted." *Id.* Randy Clayton wrote that he loves his brother and "would not have tried to help him for the last five-plus years if I thought he didn't need the help." *Id.* Randy Clayton further stated that he wanted his brother to have benefits to support himself if something happened to Randy, and he thought that Claimant's medical records speak for themselves. *Id.*

The ALJ did not appear to explicitly analyze the third-party statement in particular.[2] However, as discussed above, the ALJ noted that the evidence in the overall record did not support

---

[2] No argument was made relating to any failure to explicitly analyze the third-party statement. Regardless, this is not error where the statement largely reiterates Claimant's testimony. *See Midkiff v. Berryhill*, No. 5:18-CV-57-BO, 2019 WL 1103392, at *3 (E.D.N.C. Mar. 8, 2019) ("the ALJ did not err by declining to specifically discuss the cumulative third-party statements submitted by plaintiff's family members, which primarily reiterated the statements that plaintiff had made during her testimony") (citing *Morgan v. Barnhart*, 142 F. App'x 716, 724–25 (4th Cir. 2005) (finding no error in an ALJ's failure to address the credibility of lay witness testimony that was duplicative of plaintiff's testimony)).

that Claimant was as limited in his daily activities as he contended he was. The ALJ pointed to, as an example, that there was little or no support for Claimant's testimony that he can only walk for a few minutes at a time, or that he needs to spend the majority of his day lying down and sleeping. (R. 23, 32). The ALJ also earlier noted that despite hearing testimony, Claimant reported he was able to do some household chores, including washing dishes and doing his laundry. (R. 21, 23). Here, the ALJ discussed Claimant's impairments, and substantial evidence supports the ALJ's RFC determination.

Again, Claimant does not point to a particular error in the ALJ's treatment of Claimant's statements or the third-party reports, only that the ALJ's RFC is inconsistent with these statements. Pl.'s Mem. [DE-18] at 8. *See Hancock*, 667 F.3d at 472 (4th Cir. 2012) ("In reviewing for substantial evidence, [the court does] not undertake to reweigh conflicting evidence, make credibility determinations, or substitute our judgment for that of the ALJ.") (citation omitted). Accordingly, the court can trace the ALJ's reasoning, and the ALJ did not err in evaluating the third-party report.

### 3. Medical Opinions

Claimant generally contends that the ALJ did not properly give due consideration to opinions of consultative sources because of their consistency and supportability with the record. Pl.'s Mem. [DE-18] at 8. In his summary of medical evidence earlier in his brief, Claimant notes in particular the consultative examination report of Joseph Umesi, M.D., the "Medical Consultant Report" of Stephanie Ellis, N.P., and the consultative examination report of Elizabeth A. Kauff, M.A. *Id.* at 2–3. On the other hand, Defendant argues that the ALJ properly considered the opinion evidence. Def.'s Mem. [DE-20] at 8–9, 11–12.

The applicable regulations provide that the ALJ "will not defer or give any specific

17

evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [Claimant's] medical sources." 20 C.F.R. §§ 404.1520c(a), 416.920c(a). Instead, the ALJ must consider the persuasiveness of medical opinions using five factors: (1) supportability, meaning that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) . . . the more persuasive the medical opinions or prior administrative medical finding(s) will be"; (2) consistency, meaning that the more consistent an opinion is with other evidence in the record, the more persuasive the medical opinion will be; (3) the medical source's relationship with the claimant, which considers the length of the treating relationship, frequency of examinations, purpose of the treating relationship, extent of the treatment relationship, and whether the medical source examined the claimant; (4) specialization, meaning that "a medical source who has received advanced education and training to become a specialist may be more persuasive"; and (5) other factors that tend to support or contradict a medical opinion." *Id.* §§ 404.1520c(c)(1)–(5), 416.920c(c)(1)–(5). The most important factors are supportability and consistency. *Id.* §§ 404.1520c(a), 416.920c(a). The regulations also require the ALJ to "articulate in [his] determination or decision how persuasive [he] find[s] all of the medical opinions and all of the prior administrative medical findings in [the] case record." *Id.* §§ 404.1520c(b), 416.920c(b). However, when a medical source provides multiple opinions, the ALJ may use a single analysis to evaluate all the opinions from a single source, and the ALJ is "not required to articulate how [she] considered each medical opinion or prior administrative medical finding from one medical source individually." *Id.*

Dr. Joseph Umesi completed a December 2018 consultative examination report. (R. 589–94). Umesi noted that there were no medical records to review, but stated that the intake form

18

indicated "DM, nerve pain, back pain, anxiety, depression, and chronic heart failure." (R. 590). He noted diagnoses of obesity, uncontrolled HTN, tachycardia, bilateral shoulder pain, back pain, tooth loss, and a history of DM, neuropathy, bilateral shoulder pain, back pain, anxiety, depression, sepsis secondary to MRSA, and congestive heart failure. (R. 593). Dr. Umesi opined that based on the exam study Claimant had moderate physical function, manipulative, and postural limitations and "needs to see a psychiatrist to evaluation [sic] to opine on his mental health problems." *Id.*

The ALJ discussed the medical opinions in her decision, starting with Dr. Umesi. (R. 33–35). The ALJ noted the December 2018 consultative physical examination by Dr. Joseph Umesi, who assessed that Claimant had moderate physical functional limitation based on the examination, and that Claimant's manipulative and postural limitations were moderate. The ALJ found that Umesi's opinions were "vague, not phrased in vocationally-relevant terminology, [were] tentatively expressed, and [were] ultimately of little-to-no assistance in determining the claimant's residual functional capacity." (R. 33). As such, the ALJ reasoned that Umesi's opinions cannot be well-explained or supported, and therefore were not wholly persuasive. *Id.* However, the ALJ stated, the clinical examination findings were duly considered in determining the RFC. *Id.*

Claimant points to nothing in particular as to Umesi's opinion that makes it more supportable and consistent with the record, aside from generally contending that "the consultative examiners to whom SSA sent Mr. Clayton offered opinions that would have supported a limitation to sedentary, unskilled work." Pl.'s Mem. [DE-18] at 2, 7. As described above, the ALJ discussed at length Claimant's medical records, and found Claimant capable of performing light work with limitations. (R. 23–35). The ALJ found that treatment notes and Claimant's own statements did not indicate the level of dysfunction Claimant was alleging, and described Claimant's degenerative disc disease, degenerative joint disease, diabetes mellitus, hypertension, congestive heart failure,

19

obesity, RSD of the left upper extremity, depression, anxiety, trauma and stressor-related disorders, and personality disorders. *Id.*

Stephanie Ellis, N.P., completed a consultative "Medical Consultant Report" on December 15, 2018. (R. 839–45). Ellis noted she reviewed two records, including an undated lumbar spine x-ray (multilevel degenerative changes, upper back dextroscoloiosis, osteophytes and facet arthropathy), and a December 15, 2018 "DDS exam" ("obesity, T2DM, tachycardia, bilateral shoulder pain, back pain & tooth loss w/moderate physical/manipulative/postural limitations"). (R. 840). Ellis described a history of present illness as musculoskeletal changes with chronic pain, noting left shoulder pain with sympathetic dystrophy and upper/lower back pain with intermittent RLE sciata, and the back pain was reported to be mostly managed by diclofenac and gabapentin. *Id.* The left shoulder had limited movement, mild pain at rest that magnified with use/lifting of his arm, he had a history of left frozen shoulder in 2018 with PT and an injection treatment, and Claimant reported remaining pain and identified a bicep tendon injury. *Id.* Ellis stated Claimant did not use "the LUE much related to Reflex sympathetic dystrophy," and that Claimant reported temperature changes, air pressure, light touch and water cause excessive burning-like pain in his left wrist, hand, or fingers. Ellis stated that there was very little use for his left hand/forearm other than support, and that Claimant did not drive. *Id.* The second history of present illness was noted as "T2DM w/ insulin, uncontrolled," and Ellis noted that this was a reported diagnosis in 2017, that Claimant stated his "FSBS" is difficult to control, that he is unsure of his hgA1C, and that Claimant lives with friends and has difficulty controlling his diet because he depends on someone else for his meals. *Id.* Ellis stated generally that Claimant has left shoulder pain with reflex dystrophy and upper/lower back pain with intermittent RLE sciatica; the left tendon injury and hand pain limits his use of this arm/hand significantly; daily activity changed due to Claimant's

20

pain and external forces that impact/worsen his pain; and Claimant takes neurologic medications, but reports little to no relief in pain/nerve pain. (R. 844). Ellis then diagnosed Claimant with T2DM, uncontrolled; congestive heart failure; LUE bicep tendon injury; reflex sympathetic dystrophy, left hand; and CHF; depression, anxiety, and PTSD. (R. 845). Ellis opined that Claimant had "moderate" limitations in prolonged sitting, standing, walking, and postural activities, as well as "severe" limitations in lifting, carrying, and manipulative activities. *Id.*

The ALJ noted the consultative physical examination of Stephanie Ellis, FNP-C, which followed a physical examination in August 2020, and noted Ellis' opining that Claimant had moderate limitations in his ability for prolonged sitting, standing, walking, and in postural activities, as well as severe limitations in his ability to lift, carry, and perform manipulative activities. (R. 33). The ALJ stated, however, that Ellis assessed that Claimant had no visual or communicative limitations, and did not require an assistive device to ambulate. *Id.* Ellis' opinions, the ALJ reasoned, were vague, not phrased in vocationally-relevant terminology, were tentatively expressed, and ultimately of "little-to-no" assistance in determining Claimant's RFC. *Id.*

Again, the ALJ lengthily discussed Claimant's medical records, and found Claimant capable of performing light work with limitations. (R. 23–35). The ALJ found that treatment notes and Claimant's own statements did not indicate the level of dysfunction Claimant was alleging, and the ALJ described Claimant's degenerative disc disease, degenerative joint disease, diabetes mellitus, hypertension, congestive heart failure, obesity, RSD of the left upper extremity, depression, anxiety, trauma and stressor-related disorders, and personality disorders. *Id.* Further, the ALJ's RFC accounted for limitations such as Claimant's pushing and pulling and reaching overhead with the bilateral upper extremities, as well as handling and fingering with the left, non-dominant, upper extremity. (R. 21).

21

Elizabeth A. Kauff, M.A., a psychologist, also completed a consultative examination report dated September 6, 2020. (R. 846–53). Kauff indicated she reviewed the December 15, 2018 evaluation for disability services. (R. 847). Kauff described Claimant's present illness, personal family and social history, medical history and daily activities and functioning, mental status, and cognition. (R. 847–51). Kauff's diagnostic impressions regarding Claimant were other trauma and stressor related disorder; rule out posttraumatic stress disorder; unspecified bipolar disorder; unspecific personality disorder (borderline and antisocial features); opioid use disorder, reportedly in remission; and cocaine use disorder, reportedly in remission. (R. 851). Kauff concluded by summarizing Claimant's complaints and physical and mental problems, and that Claimant appeared capable of understanding and following simple instructions, although he would likely have difficulty working at an adequate pace secondary to distractibility. *Id.* She stated that Claimant will have problems sustaining adequate attention to tasks, trouble with his psychomotor slowing when attempting a job, as well as difficulty interacting appropriately with coworkers secondary to mood swings and poor anger management skills, and that Claimant's level of stress tolerance is poor. *Id.* Kauff recommended that Claimant continue to participate in outpatient mental health treatment, and given his history of substance abuse, he was not capable of managing his funds in his best interest if awarded benefits. *Id.*

The ALJ noted Kauff's consultative evaluation, alongside that of EJ Burgess, a licensed psychologist, and stated that Kauff assessed that the Claimant appeared capable of understanding and following simple instructions, though he would likely have problems retaining instructions throughout the workday. (R. 33). The ALJ also stated that it was noted that Claimant would likely have difficulty working at an adequate pace throughout the day secondary to distractibility, as well as problems sustaining attention to tasks, having psychomotor slowing with attempting a job, and

22

that Claimant would have trouble interacting appropriately with coworkers secondary to mood swings and poor anger management skills. *Id.* Finally, the ALJ stated that the opinions indicated that Claimant's level of stress tolerance was poor. *Id.* The ALJ found these opinions "somewhat persuasive." The ALJ recognized that Kauff and Burgess personally evaluated Claimant and that the opinions were somewhat supported by the examination and pointed to "abnormal mood, normal thought content/process, fully oriented, repeated three digits forward and two digits backwards." However, the ALJ reasoned that the opinions were not entirely consistent with the totality of the evidence. (R. 33–34). The medical evidence, the ALJ continued, showed a series of no-show appointments for mental health treatment, moderate mental status findings overall, and that although Claimant was assessed for PTSD, a mental status examination from May 2021 concluded that the claimant did not endorse any trauma-related mental health symptoms consistent with that diagnosis. (R. 34).

The ALJ lengthily discussed Claimant's medical records and found Claimant capable of performing light work with limitations. (R. 23–35). The ALJ found that treatment notes and Claimant's own statements did not indicate the level of dysfunction Claimant was alleging, and described Claimant's mental impairments such as depression, anxiety, trauma and stressor-related disorders, and personality disorders, as noted above. *Id.* Further, the ALJ's RFC accounted for mental limitations with restrictions on jobs requiring concentration, attention, and pace, as well as understanding, remembering, and carrying out simple instructions, and further added that Claimant can work in proximity to but not in coordination with other co-workers and supervisors, can only have superficial contact with the public, and can perform jobs that do not require completion of a specific number of production quotas on a defined timeline, as well as off-task time. (R. 21).

The ALJ evaluated these consultative medical opinions in conformity with the governing

23

regulation and cited substantial evidence in support of her determination. *See Dunn v. Colvin*, 607 F. App'x 264, 267 (4th Cir. 2015) ("An ALJ's determination as to the weight to be assigned to a medical opinion generally will not be disturbed absent some indication that the ALJ has dredged up 'specious inconsistencies,' or has failed to give a sufficient reason for the weight afforded a particular opinion.") (quoting *Scivally v. Sullivan*, 966 F.2d 1070, 1077 (7th Cir. 1992)). Here, the ALJ discussed Claimant's impairments, and substantial evidence supports the ALJ's RFC determination. Again, Claimant does not point to any specific and particular error in the ALJ's treatment of the medical opinions, only arguing that the ALJ's RFC is inconsistent and that the ALJ failed to give the opinions of the consultative sources due consideration. Pl.'s Mem. [DE-18] at 8; *see Hancock*, 667 F.3d at 472 ("In reviewing for substantial evidence, [the court does] not undertake to reweigh conflicting evidence, make credibility determinations, or substitute our judgment for that of the ALJ.") (citation omitted). Accordingly, the ALJ did not err in her treatment of the consultative medical opinions.

## B. Off-Task Time and Absences

Claimant contends that the ALJ failed to include in the RFC calculation an allowance for off-task time and absences that would have precluded SGA-level employment based on the VE's testimony. Pl.'s Mem. [DE-18] at 9. On the other hand, Defendant contends that any additional limitations regarding off-task time and absences for medical and mental health appointments were not supported by the record, and the ALJ was not required to accept the VE's testimony regarding limitations not supported by the whole record. Def.'s Mem. [DE-20] at 10–15.

Claimant does not cite to particular evidence in the record regarding a frequent need for medical appointments and does not cite to any authority for the proposition that such would preclude work. *See Exum v. Saul*, No. 5:19-CV-39-D, 2019 WL 5208851, at *10 (E.D.N.C. Sept.

24

13, 2019) ("Argument is not evidence, and the ALJ determined that the medical evidence and the physician's opinion evidence did not support the alleged severity of Claimant's mental impairments such that he would miss more than one day of work per month."), *report and recommendation adopted*, 2019 WL 5206249 (E.D.N.C. Oct. 15, 2019); *Duncan v. Kijakazi*, No. 7:21-CV-14-RJ, 2022 WL 4125144, at \*9 (E.D.N.C. Sept. 9, 2022) (finding the ALJ appropriately relied on VE testimony where Claimant generally argued that the VE's testimony regarding absenteeism "is simply not credible," and Claimant provided no authority for that proposition).

Further, the ALJ additionally accounted for Claimant's anxiety and stress related trauma by limiting interactions with co-workers, supervisors, and the public in a low stress environment without production quotas and being off task 5% of the workday and regular breaks. (R. 21); *see Baker v. Colvin,* No. 3:13-CV-20376, 2015 WL 5687544, at \*9 (S.D.W. Va. Sept. 8, 2015) ("The RFC, and by extension, any hypothetical question relied upon, need only reflect those limitations that are credibly established by the record.") (citing *Russell v. Barnhart*, 58 Fed. Appx. 25, 30 (4th Cir. Feb. 7, 2003)) *report and recommendation adopted*, 2015 WL 5698511 (S.D.W. Va. Sept. 28, 2015).

Accordingly, the ALJ did not err regarding any alleged need for off-task time or absences.

## VI. CONCLUSION

For the reasons stated above, Claimant's Motion for Judgment on the Pleadings [DE-17] is DENIED, Defendant's Motion for Judgment on the Pleadings [DE-19] is ALLOWED, and Defendant's final decision is affirmed.

Submitted, this the 15th day of September 2023.

Robert B. Jones, Jr.
United States Magistrate Judge

25